**Susan MONFILS, as special administrator of the Estate of Thomas Monfils, Susan Monfils, Theresa Monfils, and John–Thomas Monfils, by Bruce R. Bachhuber, guardian ad litem, Plaintiffs–Appellees,**

v.

**James TAYLOR; City of Green Bay, a municipal corporation, City of Green Bay Police Dept., Cities and Villages Mutual Insurance Company, a Wisconsin insurance corporation, et al., Defendants–Appellants.**

Nos. 97–2338, 97–4179.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 25, 1998.

Decided Dec. 23, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Jan. 28, 1999.

Michael R. Fox (argued), Fox & Fox, Madison, WI, Bruce R. Bachhuber, Hanaway, Weidner, Bachhuber, Woodward & Maloney, S.C., Green Bay, WI, for Plaintiffs–Appellees.

Gregg J. Gunta, Decker & Gunta, Milwaukee, WI, for Defendant–Appellant.

Before FLAUM, MANION, and EVANS, Circuit Judges.

TERENCE T. EVANS, Circuit Judge.

It was a gruesome discovery. On a Sunday night in November of 1992, a two-story pulp vat at the James River Paper Mill in Green Bay, Wisconsin, was drained. The body of a James River employee, Thomas Monfils, was discovered at the bottom of the vat. The body was mutilated—the vat had propellers that stirred the thick pump mixture. A rope, with a 50–pound weight, was tied to Monfils' neck.

Eventually, six James River employees were convicted of murdering Monfils. They are serving life sentences. This case concerns a claim that the Green Bay Police Department and several of its officers bear some responsibility for Monfils' death. The facts follow.

On November 10, 1992, the 35–year–old Monfils called the Green Bay Police Department with an anonymous tip. He said a fellow worker at the James River plant, Keith Kutska, was going to steal an electrical cord when he left work. The police called security at the plant and Kutska was stopped on his way out the door. He refused to submit to a search and, because of his refusal, was suspended from work for 5 days. Incensed that someone reported him, Kutska went about trying to discover who the informant was. Kutska made no secret of what he was doing, and Monfils realized he was in peril.

What followed were several more calls to the police by Monfils, trying to prevent release of a tape recording of his November 10 call, and by Kutska, trying to obtain a copy of the tape of the call so he could identify the informant. As fate would have it, members of the police department acted efficiently, if inappropriately, in response to Kutska's calls and ineptly, at best, to those placed by Monfils. The only police officer who seemed willing and able to locate a tape recording of the call released it to Kutska, who quickly recognized Monfils' voice when the tape was played. On November 21, 1992, Monfils was beaten and thrown, alive but, mercifully, unconscious, into the pulp vat with the 50–pound weight tied around his neck. It was thought that the heavy metal blades at the bottom of the vat would dispose of Monfils' body, but it was discovered 2 days later. Three years later, six of Monfils' co-workers, including Kutska, were found guilty of murder.

The details regarding the calls to the police department show that the left hand did not know—or much care—what the right hand was doing.

As we said, Monfils made his theft report telephone call to the Green Bay Police Department on November 10. At 4:45 a.m. he talked with Michelle Wickman, a GBPD Communications Center operator. Monfils said he wanted to remain anonymous (as he did in all the conversations) because Kutska was "known to be violent." Wickman then made a call to James River security and told someone there about the theft report. Because police were not dispatched to the plant, Wickman did not prepare a written report of the call. Had she written a report, it could have been accessed by using a police comput-

er. The telephone call, however, was tape-recorded by the police consistent with department policy.

Two days later, on November 12, Monfils called the police again; this time he spoke with GBPD Detective Denise Servais. He told her of his previous call and of his fear of what would happen if Kutska found out who reported him. Kutska, said Monfils, was "crazy and a biker type." Monfils wanted to be sure the tape would not get out and Servais assured him there was "no way in hell" it would be released. Servais made no written report of this call until after Monfils' body was pulled out of the pulp vat.

In his attempt to obtain the tape, Kutska called the police department on November 17 and spoke to Lieutenant Michael Mason. Kutska said he was trying to find out who reported him to James River security because that person got him in trouble. Mason said he would need to know what time the call came in, and he told Kutska to call another officer who might remember. Somehow Kutska learned the time of the call and said at work, in the presence of a number of workers, including Monfils, that he was going to get a copy of the tape.

After 10 p.m. on November 17, obviously frightened by Kutska's statements, Monfils called the police again and asked to speak to the "highest guy up." He was put through to Lieutenant Kenneth LaTour, the acting shift commander. Monfils told LaTour that he had placed an anonymous call, that Kutska was trying to get a copy of the tape, and if he did, Kutska would recognize his voice. He described Kutska as a biker type with nothing to lose and said he was afraid that one day he would not come home—that the guy would "take him out." LaTour told Monfils that he was pretty sure the tape could not be released, but he advised Monfils to call John Lampkin, who worked in the GBPD's communication section. Even though he understood Monfils' fear that he might be killed or badly hurt, LaTour did not refer the information to anyone or take any other steps. He also did not make a written report of this call.

On the 18th, Monfils called Lampkin, as LaTour had suggested. It was to Lampkin that a request for a copy of the tape would normally be directed, Police Chief Robert Langan later testified. Lampkin told Monfils that the tape would not be released because it would have to cross his desk first. He prepared a two-sentence note regarding this call, but not until a week after the murder.

Meanwhile Kutska was persisting in his attempt to obtain a tape of the November 10 anonymous call. On the 19th he called Lt. Mason, who located the tape of the call and listened to it. Mason had also checked the computer but found no written report relating to the call because, of course, up to this point no one had written one. Mason talked to an office worker, Shay Gierczak, about whether the tape should be released. The two of them called Assistant City Attorney Judith Schmidt–Lehman to discuss the issue. Of the three, only Mason had heard the tape. Schmidt–Lehman asked whether there had been a specific promise that the caller would be kept anonymous. Mason said no. He was basing his answer on the tape itself. He did not know about the other calls Monfils had made. He also had not checked with any other member of the department about the call. Even though he was not ordinarily the person who released records, that afternoon Mason called Kutska and told him that if he brought in $5 (and a blank tape) the next day he could get a copy of the tape of the call. In turn, Kutska told people at James River, including Monfils, that he would be picking up a tape recording of the call after he got out of work.

On the 20th at 10 a.m. Monfils called Lampkin, who said the tape would not be released. Lampkin transferred the call to Deputy Chief of Detectives James Taylor, to whom Monfils related what had been happening and that he feared what would happen if Kutska and his co-workers found out he snitched. Taylor assured him that the tape would not be released. But after the conversation, Taylor did nothing to prevent the release and, in fact, at that very time, the tape was on a desk in the records office 30 feet away awaiting release.

Despite Taylor's assurance that the tape would not be released, Monfils took yet another step to protect himself. He called the Brown County district attorney's office and spoke with Assistant District Attorney Pat Hitt. Hitt immediately thought there were grounds to refuse to release the tape under Wisconsin's Open Records Law, and he told Monfils that he would call Taylor to tell him not to release it. As he said he would, Hitt immediately made that call; Taylor said he knew about the case. Hitt offered to call Lampkin to make sure the tape was not released but Taylor said he would take care of it, and he assured Hitt that the tape would not be released. But all Taylor did was check the computer system for a report of the November 10th call. Finding no report because, as we know, none was prepared, he did nothing. He did not talk to Lampkin. He did not look for the tape. In his words, he "just let it go." And "go" it did.

The next day Kutska obtained a copy of the tape and played it. He recognized Monfils' voice, as did others for whom it was played. The rest is history. Monfils was dead by 7:30 a.m.

Monfils' widow, his children, and his estate filed this lawsuit under 42 U.S.C. § 1983 and Wisconsin law. It included a substantive due process claim against Deputy Chief Taylor and a claim against the City of Green Bay for ratifying Taylor's conduct. There was also an equal protection claim against the City for treating anonymous informants differently from those who disclose their identity; the individual defendants—Taylor, Servais, LaTour, Lampkin, and Mason—were sued for common law negligence.

Taylor filed a motion for summary judgment based on qualified immunity. It was denied and he appealed. While that appeal was pending, the rest of the case went to trial. At trial, there was no specific § 1983 finding against Taylor, although the jury entered a verdict against Green Bay for "ratification of unconstitutional conduct on the part of Chief Deputy Taylor." There was a verdict against the City based on the equal protection claim. The individual defendants,

including Taylor, were found to have been negligent under state law. The jury awarded damages totaling just over $2 million. [The jury verdict is affixed as an appendix to this opinion.]

This appeal was filed from the judgment entered on the jury verdict. It is consolidated with Taylor's appeal from the denial of his motion for qualified immunity. This issue, which will require most of our attention, involves the substantive due process claim against the City, which is, in turn, predicated upon Deputy Chief Taylor's allegedly unconstitutional conduct. Related as well is whether Taylor is entitled to qualified immunity and, if not, what must be done about the substantive due process claim against Taylor individually.

The plaintiffs claimed that the City violated Thomas Monfils' substantive due process rights in three ways: by constitutionally inadequate training of its officers; through a custom or policy of the City; and by ratification of Deputy Chief Taylor's unconstitutional conduct. The plaintiffs prevailed on the third constitutional claim which involves two issues—whether Taylor's conduct was unconstitutional and whether it was ratified by the City. The nature of the substantive due process claim is relevant to Taylor's qualified immunity claim.

First, we consider whether Taylor's conduct could give rise to a substantive due process claim against the City. The City did not and does not object to the jury instruction on the substantive due process claim, nor does it contend that, as a matter of law, the events here do not fall within the contours of a substantive due process claim. The City contends only that the evidence was not sufficient to support the jury verdict.[1] When the sufficiency of the evidence is the issue, our concern ordinarily is only whether interpreting the facts in the light most favorable to the plaintiffs, a reasonable jury could conclude that Monfils' substantive due process rights were violated. *BE & K Constr. Co. v. Will & Grundy Counties Bldg. Trades Council*, 156 F.3d 756 (7th Cir.1998). But

---

1. The City does not contend that the evidence was insufficient as to Taylor's state of mind. We therefore do not enter the thicket involving what standard is applicable.

because a substantive due process claim such as this one must be so closely intertwined with the facts, and because our discussion of ratification depends on what exactly is or is not being ratified, we will discuss briefly the nature of the claim.

We start with *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 195, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), in which the Supreme Court made clear that the Due Process Clause is a limitation on the state's power to act, not a guarantee of certain minimal levels of safety and security. Two "exceptions" have grown out of *DeShaney*. One exists if the state has a "special relationship" with a person, that is, if the state has custody of a person, thus cutting off alternate avenues of aid. *See Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) (requiring services to involuntarily committed mental patients); *Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (requiring medical care for suspects in police custody); *K.H. Through Murphy v. Morgan*, 914 F.2d 846 (7th Cir.1990) (holding that a child in state custody has a liberty interest in not being placed in an abusive foster home). The other is the state-created danger exception. The Court said in *DeShaney*, "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." At 201, 109 S.Ct. 998. From that statement courts have concluded that liability exists when the state "affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir.1993), *cert. denied*, 510 U.S. 947, 114 S.Ct. 389, 126 L.Ed.2d 337 (1993). In *Wallace v. Adkins*, 115 F.3d 427 (7th Cir.1997), we recognized that an order that a prison guard remain at his especially dangerous post, while at the same time offering him false assurances that he would be protected, qualifies as an affirmative act for purposes of a state-created danger claim. *See also Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir.1996); *Uhlrig v. Harder*, 64 F.3d 567 (10th Cir.1995), *cert. denied*, 516 U.S. 1118, 116 S.Ct. 924, 133 L.Ed.2d 853 (1996);

*Dwares v. City of New York*, 985 F.2d 94 (2d Cir.1993); *Freeman v. Ferguson*, 911 F.2d 52 (8th Cir.1990).

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir.1998), involved a situation analogous to the one before us. In *Kallstrom* undercover police officers sought to prevent release of information about their addresses and phone numbers and those of their family members. The information was, nevertheless, released. The court found that the "City's actions placed the officers and their family members in 'special danger' by substantially increasing the likelihood that a private actor would deprive them of their liberty interest in personal security." The officers' claims were "constitutionally cognizable." At 1067.

However, relying on *Wallace*, the City contends that it is also a requirement of a claim under the state-created danger theory that the state actor have cut off all avenues of self-help. The City then proceeds to argue that the evidence here does not support a finding that Monfils had no alternative means of self-help. We first note that the unobjected-to jury instruction in this case *included* a reference to self-help:

> The government may be held to have violated the Constitution if the government creates a dangerous situation or renders a person more vulnerable to danger while constricting reasonable avenues of self-help.

> The plaintiffs contend that Deputy Chief Taylor deprived Thomas Monfils of due process by rendering him more vulnerable to danger while constricting his reasonable avenues of self-help.

We also note that the jury could reasonably have concluded that once the tape was released, Monfils' ability to protect himself was severely limited. It's true he could have left the plant the morning he was killed. However, unlike the prison guard in *Wallace*, he would not necessarily have escaped his murderers by leaving; they, unlike the inmates in *Wallace*, were not confined to the location of the injury. Leaving the plant would not have solved Monfils' problem. It is, in fact,

hard to see what more Monfils could have done to protect himself.

■ Most importantly, we note that by having the requirement regarding avenues of self-help included in the instructions, the City received a benefit it was not strictly entitled to. In a claim such as this one based on a state-created danger, there is no absolute requirement that all avenues of self-help be restricted. *Wallace*, the case on which the City relies, involved, as we have said, a prison guard. He was attempting to establish liability by claiming both that he had a "special relationship" with the state because of his position as a guard and that prison officials placed him in a position of danger he would not otherwise have faced. The requirement that self-help be restricted went only to his claim of a special relationship. The basis of a special relationship is that the state has some sort of control or custody over the individual, as in the case of prisoners, involuntarily committed mentally ill persons, or foster children. The state's duty to protect those persons or to provide services for them arises from that custody or control. For a person not in custody to claim a special relationship, he must at least claim that the state had sufficient control to cut off other avenues of aid. Recently, in a case which seems to merge the two theories, we have required a finding that alternative avenues of aid have been cut off. *Estate of Stevens v. City of Green Bay*, 105 F.3d 1169 (7th Cir. 1997). *Wallace*, however, states no such requirement. We think *Wallace* correctly states the law of this circuit: a state can be held to have violated due process by placing a person in a position of heightened danger without cutting off other avenues of aid. As we said in *Wallace*, the elements of the claim are: "what actions did the prison officials affirmatively take, and what dangers would Wallace otherwise have faced?" At 430.

All of that said, we should now move to the real issue before us: Was the evidence sufficient for the jury to conclude that Taylor placed Monfils in a position of danger greater than he would otherwise have faced? For reasons which, we hope, will become clear, we pass that issue for now and turn instead to a discussion of "ratification" as that term is used in the jury's verdict.

■ As for the City's liability, Taylor's conduct is only one part of the issue; the other is whether the City "ratified" his conduct, conduct the jury found to be unconstitutional. It is well-established that a municipality is not liable under § 1983 unless a loss is caused by a municipal custom or policy. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, the precise boundaries of municipal liability have been fine-tuned. It is in the context of fine-tuning that "ratification" as a basis for municipal liability was set out in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). The plaintiffs assert that what *Praprotnik* holds is that

> [i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

At 127, 108 S.Ct. 915. There are, however, significant modifications to that bald statement. The Court also said:

> Simply going along with discretionary decisions made by one's subordinates, however, is not a delegation to them of the authority to make policy.

At 130, 108 S.Ct. 915. Two examples are given of situations in which a supervisor could realistically be deemed to have adopted a policy which was formulated by a lower-ranking official. One is if the decision by a subordinate was "cast in the form of a policy statement and expressly approved by the supervising policymaker." At 130, 108 S.Ct. 915. The other is if a "series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware." At 130, 108 S.Ct. 915. What seems clear to us is that the mere fact that a supervisor failed to discipline a subordinate—the argument raised by the plaintiffs, for the City didn't demote or fire Taylor—does not a municipal policy make.

■ We think the evidence presented in this case was insufficient to establish municipal liability against the City of Green Bay

under a theory of ratification. It's true that Chief Langan did not discipline his officers. Maybe he should have. But neither did he come close to ratifying their behavior so as to establish a municipal policy regarding how the release of the tape recording was handled. Rather, he expressed the view that what happened with the tape was "an unfortunate situation that so many things happened and nothing came together." He noted that in his view his officers acted in "good faith." What he really says is that he did not place blame on his officers, not that he approved of their conduct to the extent that it rose to the level of a custom or policy of the City of Green Bay. The evidence was insufficient to establish ratification.

Accordingly, because there was no "ratification," the City of Green Bay cannot be held liable for a substantive due process violation. However, what about the issue of the liability of Deputy Chief Taylor?

As we have said, Taylor claims qualified immunity from suit. The district court denied his motion; he appealed. Our jurisdiction over an appeal from a denial of qualified immunity depends on the reasons for the denial—that is, we have no jurisdiction if the denial was based on the existence of disputed issues of fact. *Johnson v. Jones*, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *Clash v. Beatty*, 77 F.3d 1045 (7th Cir.1996). We ordered the district court to state the reasons for the denial and nothing in its subsequent opinion indicates that there were genuine issues of material fact which precluded summary judgment. Accordingly, the issue before us is a legal one: whether Taylor's conduct violates a constitutional right which was clearly established in 1992. In this circuit, a recognition of a claim based on a state-created danger precedes *DeShaney*, which was decided in 1989. In *White v. Rochford*, 592 F.2d 381 (7th Cir.1979), we considered whether police officers may abandon children on the Chicago Skyway after arresting their custodian and depriving them of adult protection. We concluded they could not. We said that "such conduct indisputably breached the Due Process Clause." In other cases, we continued to recognize that a governmental official could, if the circum-

stances were right, be held responsible for creating a danger in a noncustodial setting. *Archie v. City of Racine*, 847 F.2d 1211 (7th Cir.1988) (*en banc*), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989). Our cases recognized that the constitutional right involved was not a right to protection, per se, but rather a right not to be placed at harm by state officials. In a case decided just after the events here, we reviewed the contours of the state-created danger theory and concluded:

> While we have been hesitant to find section 1983 liability outside the custodial setting ... we find that plaintiffs such as the Reeds may state claims for civil rights violations if they allege state action that creates, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to a danger [than] they otherwise would have been.

*Reed v. Gardner*, 986 F.2d 1122, 1126 (7th Cir.1993). Taylor clearly created a danger and, by assuring Hitt (the assistant district attorney) that he would make sure the tape was not released but not following through, he created a danger Monfils would not otherwise have faced. Taylor is not and never was entitled to qualified immunity against this claim.

The sixty-four-dollar question which remains is what happens now—must there be another trial to determine if Taylor violated Monfils' right to substantive due process? Or should we answer the question we left unanswered earlier in our opinion: Is the evidence sufficient to show that Taylor violated Monfils' right to substantive due process and find the answer—whatever it is—binding as to the claim against Taylor individually? Neither party has spent much time considering this question. But because the jury trial proceeded while Taylor's appeal on the qualified immunity issue was pending, we are left with what turns out to be a thorny problem. We are dismayed that this case proceeded in a fashion which allowed this problem to arise.

The doctrine of qualified immunity, as it was redefined in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), led to the doctrine announced in *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105

S.Ct. 2806, 86 L.Ed.2d 411 (1985) that a "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' ...." Taken together, the cases make clear that the purpose of the doctrine is to protect a defendant's "right not to *stand trial* on the plaintiff's allegations" if he has qualified immunity from suit. At 527, 105 S.Ct. 2806.

And the fact is that everyone proceeded in this case as though Taylor's individual constitutional liability was not being tried. The following exchange occurred the first day of trial:

> MR. REAK (counsel for the defendants): Last thing, Your Honor, this does not pertain to a stipulation, but we received your order regarding the Taylor appeal this morning. We just wanted to state on the record by having Mr. Taylor here and allowing him to participate in the trial with respect to the negligence claims against him, we are not waiving our belief that the Court of Appeals now has jurisdiction over the constitutional claim against him and this court does not.
>
> THE COURT: All right, I don't think there's any problem with that. If he takes the stand of course he's subject to cross-examination like any other witness. So—
>
> MR. REAK: We concede that, your Honor. But the issue of whether or not he violated Mr. Monfils' constitutional rights will not be going to the jury.

It is true that at trial Taylor was not the subject of a jury question as to a substantive due process violation. But, in what is a very important concern, he was the only person whose conduct was used to attempt to establish a substantive due process violation against the City. And the City, with the same lawyer representing it who represented Taylor (and the other officers) on the negligence claim against him, vigorously argued that Taylor's actions did not violate Monfil's constitutional rights. The question submitted to the jury was:

> Did the City of Green Bay violate the constitutional rights of Thomas Monfils not to be deprived of his life or liberty absent

due process of law in one or more of the following ways:

> . . .
>
> C. Ratification of unconstitutional conduct on the part of Chief Deputy Taylor?

The answer was "yes." The jury could not have answered "yes" to the question without concluding that Taylor violated Monfils' constitutional rights. And that is precisely the claim against him individually.

The unique situation presented here puts us in the position of having to determine whether the individual claim against Taylor must be tried—which would really be a second trial of the issue, or whether the verdict question, which by necessity includes a finding that Taylor's conduct was unconstitutional, if supported by sufficient evidence, will allow us to bypass another trial.

We begin to answer this question by looking at Taylor's role in the trial. First of all, we note that Taylor's appeal of the qualified immunity decision did not spare him a trial. His conduct was on trial. In addition, as we have noted, the attorneys who defended the case represented all of the defendants on all of the claims. They represented each of the individual officers who were involved in the negligence claims. Taylor was one of those officers, and the jury found that he was responsible for 40% of the causal negligence (more than any of the other individual defendants[2]) leading to Monfils' death. In addition, the same attorneys who tried the case represent Taylor on his appeal of the qualified immunity decision. Also important is the fact that Taylor's interest is identical to that of the City, and he is entitled, under Wisconsin law, to indemnification by the City (which, no doubt, is insured) for any award assessed against him. *See* § 895.46 Wis. Stat.

Taylor's actions played a major part in the trial. Dennis K. Waller, the plaintiffs' expert regarding police procedures, testified that Taylor knew Monfils was frightened and that Taylor took responsibility for preventing the

---

**2.** The other negligence findings were: LaTour (25%); Servais (15%); Lampkin (10%); and Ma-son (10%). The jury found that Monfils was not negligent.

release of the tape but did nothing about it. In contrast, the defendants' expert, John G. Peters, Jr., testified that in his opinion Taylor "followed generally accepted practices and conformed to the police department policy that was in effect."

Taylor testified fully regarding his actions. He acknowledged that the information in his possession indicated that the tape should not be released. And that being the case, the department's policy manual indicated that the chief of police should be contacted if release were to be denied. Taylor testified that he did not notify the chief, or the person serving in the capacity of chief, as the chief happened to be unavailable at the time. Taylor also acknowledged receiving a call from Hitt, who told him the tape should not be released. He also testified that he looked for a report and, finding none, did nothing. Rather than take steps to prevent the tape from being released, he went deer hunting. Finally, the closing arguments for both sides explored and analyzed Taylor's conduct. So even though the qualified immunity issue was on appeal, the fact of the matter is that Taylor's conduct was the subject of considerable attention during the trial. The individual constitutional claim against Taylor, given the very unusual circumstances of this case, was, for all intents and purposes, tried to this jury. And it was not only tried in a legalistic, technical sense; in reality, the issue was tried in full, for Taylor's lawyers argued that his conduct, in all respects, was blameless.

In the unique circumstances of this case, we see a number of problems if the matter is now sent back to the district court for another trial (which would actually be a retrial) of the due process claim against Taylor individually. If the case against Taylor is tried again, a risk of inconsistent verdicts arises. We would also be running afoul of principles of judicial economy and, we think, fairness. We will, therefore, proceed to answer the as-yet unanswered question as to whether the evidence was sufficient for the jury to conclude that Taylor placed Monfils in a position of danger greater than he would otherwise have faced. We will then go on to explain why our answer to that question is "yes."

To repeat ourselves, Taylor knew of the increased danger, for he talked to Monfils about it. He was told by Hitt that the tape fell within an exception to the Open Records Law and should not be released. He assured Hitt that he would prevent its release, but he nevertheless allowed it to get out, which, in turn, allowed Kutska to identify Monfils as the informant. As an experienced police officer, Taylor knew the dangers informants face. Given these facts, it is hard to imagine how the jury could have failed to conclude that Taylor placed Monfils in a position of heightened danger. The evidence is sufficient to uphold that part of the verdict based on Taylor's unconstitutional conduct. We conclude that the jury has in effect made a finding that Taylor violated Monfils' substantive due process rights. Weighing all the factors and, above all, emphasizing that our conclusion grows out of the unique posture of the case—a posture we recommend that district courts attempt to avoid in the future—we find, based on the principle of law of the case, that the jury's finding of "unconstitutional conduct on the part of Chief Deputy Taylor" (verdict question 1AC) is binding as to the claim against Taylor in his individual capacity.

The law of the case doctrine is a flexible rule, which "merely expresses the practice of courts generally to refuse to reopen what has been decided . . . ."; it is "not a limit on their power." *Messinger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912).

It is, however, a "rule of practice, based on sound policy." *Creek v. Village of Westhaven*, 144 F.3d 441 (7th Cir.1998). Once an issue is litigated and decided, "that should be the end of the matter." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527 (7th Cir.1982), *cert. denied*, 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983). We have recently discussed whether a determination in a summary judgment decision regarding the amount of a setoff should prevent, on law-of-the-case grounds, submission of that issue to the jury. We determined that it was not error to allow the jury to re-decide the issue. We stated that the "presumption that a ruling made at one stage of the proceedings will be adhered to throughout the suit" was one

"whose strength varies with the circumstances; it is not a straightjacket." *Alston v. King*, 157 F.3d 1113, 1116 (7th Cir.1998), quoting *Avitia v. Metropolitan Club of Chicago, Inc.*, 49 F.3d 1219 (7th Cir.1995). Unlike that case, in the case before us today the circumstances give the presumption great strength.

■ Furthermore, the most compelling application of the doctrine occurs when a court of appeals has decided an issue. Then the district court is required to comply with the express or implied ruling of that court. *Waid v. Merrill Area Pub. Sch.*, 130 F.3d 1268 (1997). Ordinarily, there would be no question that our decision that the verdict of the jury is supported by sufficient evidence is controlling on the district court.

■ In this case, though, we remain mindful that the constitutional claims against Taylor individually were, at least technically speaking, not tried. However, Taylor and the City were in privity. And the concept of privity, along with the principles of res judicata and collateral estoppel,[3] supports our conclusion that this case should not be tried a second time. On top of that, the concept of what is sometimes called "virtual representation" comes into play.

> Under the doctrine of virtual representation, " 'a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative.' "

In the *Matter of L & S Industries, Inc.*, 989 F.2d 929, 933 (7th Cir.1993), quoting *Kerr–McGee Chem. Corp. v. Hartigan*, 816 F.2d 1177 (7th Cir.1987). Just the other day, we noted that the theory of "virtual representation" has serious limitations in the context of collateral estoppel where parties in a case were claimed to have been "virtually represented" by different parties in a completely different case. *Tice, et al. v. American Airlines, Inc.*, 1998 WL 877779 (7th Cir., Dec.17, 1998). But the theory is not lifeless in the context of our case. We think it explains a

good deal about the privity between the parties in our case. For instance, one fact looked to in determining whether virtual representation exists is whether "representation of a non-party falls within some pre-existing relationship—as defined by statute, for example . . . ." *L & S Industries*, at 933.

■ That is precisely what we have here. By statute, the City of Green Bay must indemnify Taylor. That fact, plus all the other factors we have mentioned, indicate clearly that the City of Green Bay was Taylor's virtual representative. Their interests were in privity. Justice and fairness require that Taylor be bound by the jury's verdict, which we have just decided is supported by substantial evidence.

■ The other claim against the City of Green Bay is an equal protection claim that the City had a policy of treating persons who called the department and gave their name differently from those who called and remained anonymous. There is no evidence from which a rational jury could conclude that such a policy existed. In fact, Officer Wickman, who took the November 12th call, had to consult with a superior because she had not taken a call like this before. The verdict against the City of Green Bay on the equal protection claim must be set aside.

We now turn to state law claims. The defendants do not contest the verdicts against them premised on negligence law. They do, however, contend that under Wisconsin law they are entitled to discretionary act immunity.

■ Public officials in Wisconsin are immune from tort liability for acts performed in the scope of their official authority and in the line of their official duties. *Cords v. Anderson*, 80 Wis.2d 525, 259 N.W.2d 672 (1977). Exceptions to immunity include violations of a ministerial duty. In addition, sometimes once a discretionary decision is made, carrying out that decision may be purely ministerial. *Chart v. Dvorak*, 57 Wis.2d 92, 203 N.W.2d 673 (1973). So it is

---

**3.** We have recently said, "The doctrine of res judicata limits relitigation of an issue in a subsequent suit. The doctrine of law of the case limits relitigation of an issue at a subsequent stage of the same suit." *Payne v. Churchich*, 161 F.3d 1030, 1998 WL 774833 (7th Cir.1998).

crucial here to characterize the duty the defendants had.

 The police policy said that the employees of the department shall treat as confidential all confidential information—not a particularly helpful policy. Reasons that may justify denying the release of information include protection of witnesses and informants. Requests that employees deemed proper for denial were to be referred to the chief's office with an explanation as to why they should be denied. The chief would then decide whether to deny access. The actions of the defendants fall within the ministerial exception to discretionary act immunity, and the negligence findings against them will not be set aside.

In summary, we vacate the finding that the City of Green Bay violated Thomas Monfils' constitutional rights to due process or equal protection. We direct that judgment be entered against Taylor on an individual claim against him consistent with the jury's answer to question 1C on the verdict, and we affirm the judgment on the negligence claims and the damage findings. The case is remanded to the district court for the entry of judgment consistent with this opinion. Costs are awarded to the plaintiffs-appellees.

APPENDIX

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN**

SUSAN MONFILS, As Special
Administrator of the Estate of
Thomas Monfils, SUSAN MONFILS,
THERESA MONFILS, and JOHN–THOMAS
MONFILS By BRUCE R. BACHHUBER,
Their Guardian Ad Litem,

 Plaintiffs, Case No. 95–C–1239

 v.

CITY OF GREEN BAY, CITIES AND
VILLAGES MUTUAL INS. CO.,
DEPUTY CHIEF JAMES TAYLOR,
JOHN LAMPKIN, MICHAEL MASON,
KENLATOUR, JUDITH SCHMIDT–
LEHMAN, and DENISE SERVAIS,

 Defendants.

SPECIAL VERDICT

We, the Jury in the above-entitled case, having been duly impaneled and sworn to try the issues, find for our special verdict as follows:

QUESTION NO. 1:

Did the City of Green Bay violate the constitutional rights of Thomas Monfils not to be deprived of his life or liberty absent due process of law in one or more of the following ways:

 A. Constitutionally inadequate training?

 Yes _____ No X

 B. A custom or policy that caused the constitutional deprivation of Thomas Monfils' rights?

 Yes _____ No X

 C. Ratification of unconstitutional conduct on the part of Chief Deputy Taylor?

 Yes X No _____

QUESTION NO 2:

If you have answered "yes" to either subparts A, B. or C, of Question No.1, then answer this question.

Was such conduct a proximate cause of the injuries to Thomas Monfils?

 Yes X No _____

QUESTION NO. 3:

Did the City of Green Bay deprive Thomas Monfils of his right to equal protection under the law?

 Yes X No _____

QUESTION NO 4:

If you answered Question No. 3 "yes," then answer this question.
Was such conduct a proximate cause of the injuries to Thomas Monfils?

Yes X No _____

QUESTION NO. 5:

Were the following persons negligent with respect to Thomas Monfils' safety?

| | | | | | |
|---|---|---|---|---|---|
| A. | Denise Servais | Yes | X | No | |
| B. | Kenneth LaTour | Yes | X | No | |
| C. | John Lampkin | Yes | X | No | |
| D. | Michael Mason | Yes | X | No | |
| E. | James Taylor | Yes | X | No | |

If you answered 'yes' to any of the subparts of Question No. 5, then answer this question.

QUESTION NO. 6:

Was such conduct a cause of the injuries to Thomas Monfils?

| | | | | | |
|---|---|---|---|---|---|
| A. | Denise Servais | Yes | X | No | |
| B. | Kenneth LaTour | Yes | X | No | |
| C. | John Lampkin | Yes | X | No | |
| D. | Michael Mason | Yes | X | No | |
| E. | James Taylor | Yes | X | No | |

QUESTION NO. 7:

Was Thomas Monfils negligent with respect to his own safety?

Yes _____ No X _____

QUESTION NO. 8:

If you have answered Question No. 7 'yes,' then answer this question.
Was such negligence a cause of the injuries to Thomas Monfils?

Yes _____ No _____

QUESTION NO. 9:

If, and only if, you have answered 'yes' to any of the subparts of Question No. 6 and Question No. 8, then answer this question. You are to answer this question only if you have found that one or more of the parties named in Question No. 6 and the party named in Question No. 8 were causally negligent. If, by your previous answers, you are required to answer this question, you will answer the subdivisions thereof, assigning to each person such percentage, or part of 100%, which you find to a reasonable certainty is attributable to that party. You will determine how much and to what extent each party is to blame for the injuries to Tom Monfils and whether the conduct of one made a larger, equal, or smaller contribution than the other. You will fix the percentage attributable to each party in proportion to the fault that the party contributed to cause Tom Monfils' injuries.

The burden of proof on these subdivisions is on the one who asserts the percentage of causal negligence attributable to the other.

| | | | |
|---|---|---|---|
| A. | Denise Servais | 15 | % |
| B. | Kenneth LaTour | 25 | % |
| C. | John Lampkin | 10 | % |
| D. | Michael Mason | 10 | % |
| E. | James Taylor | 40 | % |
| F. | Thomas Monfils | 0 | % |
| | TOTAL | 100 | % |

**QUESTION NO. 10:**

What sum of money, if any, will reasonably and fairly compensate the Estate of Thomas Monfils for:

| | | |
|---|---|---|
| A. | Thomas Monfils' pain and suffering | $140,000 |
| B. | Thomas Monfils' burial and funeral expenses (answered by the court) | $7,494.85 |

**QUESTION NO. 11:**

What sum of money, if any, will reasonably and fairly compensate Susan Monfils for:

| | | |
|---|---|---|
| A. | Her loss of society and companionship? | $ 25,000 |
| B. | Her mental pain and suffering that resulted from her husband's death? | $ 75,000 |
| C. | Her loss of support and services? | $538,000 |

**QUESTION NO. 12:**

What sum of money, if any, will reasonably and fairly compensate Theresa Monfils for:

| | | |
|---|---|---|
| A. | The pecuniary loss suffered by her | $225,000 |
| B. | Her loss of society and companionship | $200,000 |
| C. | Her mental pain and suffering that resulted from her father's death | $225,000 |

**QUESTION NO. 13:**

What sum of money, if any, will reasonably and fairly compensate John–Thomas Monfils for:

| | | |
|---|---|---|
| A. | The pecuniary loss suffered by him | $225,000 |
| B. | His loss of society and companionship | $200,000 |
| C. | His mental pain and suffering that resulted from his father's death | $225,000 |

We, the jury unanimously find the facts to be as indicated in our answers to the foregoing questions.

Dated this _27_ day of _June_, 1997.

_Thomas Ball_
**Foreperson**

_Patricia A. Holzbauer_
**Juror**

_Billy J. Thorpe_
**Juror**

_Wesley N. Bond_
**Juror**

_Patricia Rische_
**Juror**

_Daniel H. Otte_
**Juror**

_Frederick H. Abbott Jr._
**Juror**

_Barbara A. Vasko_
**Juror**