**Minee L. SLOANE and Clyde G. Sloane, Personal Representatives for the Estate of David Aron Sloane, Plaintiffs,**

v.

**KANAWHA COUNTY SHERIFF DEPARTMENT, a municipal corporation; K.S. Moore and S.C. Crosier, Defendants.**

No. CIV.A. 2:04–476.

United States District Court,
S.D. West Virginia,
Charleston Division.

Oct. 15, 2004.

Cynthia Evans, Jason E. Huber, Forman & Huber, Charleston, WV, for Plaintiffs.

David F. Nelson, Schumacher Francis & Nelson, Charleston, WV, for Defendants.

## ORDER

CHAMBERS, District Judge.

Pending is Defendant's motion to dismiss for failure to state a claim upon which relief can be granted. For the reasons set forth herein, the motion is **DENIED**.

### I. Plaintiffs' Allegations[1] and Procedural Background

On April 7, 2002, seventeen-year old David Sloane ("David"), the grandson of Plaintiffs Minee and Clyde Sloane, was accused of "date rape."[2] On that date, Defendants Kanawha County Sheriff's Deputy K.S. Moore ("Moore") and Lieutenant S.C. Crosier ("Crosier") interrogated David, who contended that he had only

---

1. Because this case is before the Court on a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court accepts as true the factual allegations of the complaint. *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir.1993).

2. The phrase "date rape," though without legal significance, is commonly used to refer to a rape in which the attacker is a friend or other acquaintance of the victim.

consensual sex with the alleged victim, outside the presence of Plaintiffs, who were David's legal guardians. On April 9, 2002, Moore took David from his home without his grandparents and again interrogated him. Although Moore stated that he was worried that David might feel "he was up against a wall" and become suicidal, he continued to question David without his grandparents present. David was, in fact, not guilty of any crime.

On April 16, 2002, Crosier conducted a third interrogation. While David's grandparents were not present, David's counselor[3] was. Crosier began the interrogation by asking David, "How many times do you masturbate?" Crozier conducted a polygraph test, during which he asked David's counselor to leave the room; the counselor was permitted to return once the polygraph was complete. Crosier put a chair in front of the door to the room to prevent David from leaving. He accused David, who was trapped between a desk and the wall, of being deceptive and told him that he would be charged with a crime. Crosier also told David that David was a rapist who would rape again. Although David never acknowledged committing the crime, Crosier pressured and coerced David into writing an apology to the alleged victim. Crosier implied that David would lose his freedom and be arrested; as a result of the encounter, David became suicidal. David was permitted to leave that day, and was driven home by his counselor. Sometime between arriving home and the early morning hours of April 17, 2002, David took his own life by hanging himself from a tree in the backyard of his house, leaving behind a suicide note referencing the polygraph test and his expectation, based on Crosier's statements, that he would soon be incarcerated.

Plaintiffs filed a complaint in the Circuit Court of Kanawha County, West Virginia, alleging that Moore and Crosier had violated David's rights under both the federal and West Virginia constitutions. Plaintiffs further allege that Moore and Crosier were acting pursuant to policies, customs, and practices promulgated by Defendant Kanawha County Sheriff Department ("the Department"). Plaintiffs also allege that the Department was negligent in the hiring and supervision of Crosier. Defendants timely removed the case to this Court, and this Court has denied a motion to remand. All three defendants now join in a motion to dismiss, arguing that Plaintiffs' allegations, even if true, do not constitute a violation of federal or state law.

## II. Analysis

In their memorandum in opposition to Defendants' motion,[4] Plaintiffs articulate two possible theories-the "state-created danger" doctrine and equal protection-under which Defendants might be held liable for David's death under 42 U.S.C. § 1983.[5]

---

3. Plaintiffs do not specify the training or credentials of this "counselor," and he or she is not named as a party to this action.

4. Initially, Plaintiffs argued that despite the complaint's invocation of David's federal constitutional rights, they were not seeking relief under 42 U.S.C. § 1983, thus rendering removal to a federal court improper. Though the Court has rejected this assertion, the Court recognizes that it placed Plaintiffs' counsel in a difficult position by requiring simultaneous briefing on the motions to remand and to dismiss. Nonetheless, the Court finds that Plaintiffs have defended the viability of their federal claims sufficiently enough to withstand the instant motion.

5. Plaintiffs also argue that their complaint can be read to state a cause of action under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq., or section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq. While the Court declines to determine whether Plaintiffs' allegations could state a violation of those statutes, the Court finds that Plaintiffs have not asserted a violation of them in their complaint. If Plain-

They also argue that the coercive interrogations conducted by Moore and Crosier were in violation of David's substantive due process rights, even if they had not resulted in his suicide. Finally, Plaintiffs urge the Court to decline to exercise supplemental jurisdiction over the state law claims should their federal claims fail as a matter of law.

A Rule 12(b)(6) motion tests the sufficiency of the pleading. It does not resolve factual disputes, the merits of a claim, or the applicability of defenses. *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir.1992). Dismissal is appropriate only when it appears beyond a doubt that no set of facts would entitle the pleader to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The motion to dismiss for failure to state a claim is viewed with disfavor and rarely granted. *See Rogers v. Jefferson–Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir.1989). Where, as here, the court is "testing the sufficiency of a civil rights complaint, 'we must be especially solicitous of the wrongs alleged' and 'must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged.'" *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999) (quoting *Harrison v. United States Postal Serv.*, 840 F.2d 1149, 1152 (4th Cir.1988)).

### A. State–Created Danger Doctrine

 Under the state-created danger doctrine, state actors may held to be liable for a violation of an individual's liberty interest in bodily integrity, even though the actual physical injury of which a plaintiff complains was the direct result of violence perpetrated by private actors. As

the Supreme Court articulated in *DeShaney v. Winnebago County Department of Social Services.*, 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), ordinarily, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Nonetheless, Chief Justice Rehnquist, writing for the Court in *DeShaney*, recognized two exceptions to that general rule. First, the state may have an affirmative duty to protect from harm an individual with whom it has a special relationship. *Id.* at 200, 109 S.Ct. 998; *see also Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Second, the Court left room for the possibility that due process concerns would require a state to protect an individual from a danger created or enhanced by the state or its agents. *DeShaney*, 489 U.S. at 201, 109 S.Ct. 998. The second exception is at issue in the present case.

In the Fourth Circuit, the leading case on the duty of a state to protect its citizens from dangers posed by private actors is *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir.1995) (en banc). *Pinder* involved "genuinely tragic" facts. *Id.* at 1172. The defendant, Officer Donald Johnson, responded to a call reporting a domestic disturbance at the home of the plaintiff, Carol Pinder, where Johnson arrested Pinder's boyfriend. *Id.* Despite Johnson's assurances to Pinder that it would be safe for her to leave her children home alone and go to work because her boyfriend would be incarcerated overnight, the boyfriend was, in fact, released shortly after being taken into custody. *Id.* The boyfriend returned to Pinder's home and set it ablaze. *Id.* Pinder was not present, as she had relied on the officer's assurances;

---

tiffs wish to pursue relief under federal disability law, they should file a motion for leave

to amend their complaint in order to do so.

however, her three children were asleep and died in the fire. *Id.* The boyfriend was convicted of three counts of first degree murder. *Id.*

As Defendants correctly point out, the *Pinder* court refused to hold Johnson liable for the murderous acts of a private actor.

> We ... cannot accept Pinder's attempt to escape the import of *DeShaney* by characterizing her claim as one of affirmative misconduct by the state in "creating or enhancing" the danger, instead of an omission. She emphasizes the "actions" that Johnson took in making assurances, and in deciding not to charge [the boyfriend] with any serious offense. By this measure, every representation by the police and every failure to incarcerate would constitute "affirmative actions," giving rise to civil liability. At some point on the spectrum between action and inaction, the state's conduct may implicate it in the harm caused, but no such point is reached here. It cannot be that the state "commits an affirmative act" or "creates a danger" every time it does anything that makes injury at the hands of a third party more likely. If so, the state would be liable for every crime committed by the prisoners it released.

*Id.* at 1175.[6] Even under this narrow view of the state-created danger doctrine, though, the Fourth Circuit recognized that "when the state itself creates the danger-

ous situation that resulted in a victim's injury, the absence of a custodial relationship may not be dispositive. In such instances, the state is not merely accused of a failure to act; it becomes much more akin to an actor itself directly causing harm to the injured party." *Id.* at 1777.

Plaintiffs' allegations are not similar to those examined by the Fourth Circuit in *Pinder.* Crosier and Moore are not accused of merely standing idly by while a private actor harmed David. Instead, the Sloanes claim that Crosier and Moore took affirmative actions (specifically, engaging in an unduly coercive interrogation) that led to David's death. The Sloanes have alleged that Crosier's actions made David, whom the police knew to be emotionally troubled, suicidal. Since *Pinder,* courts within the Fourth Circuit have held that the affirmative acts of a state actor that create or enhance a risk of injury or death may give rise to liability under 42 U.S.C. § 1983. *See, e.g., Pullium v. Ceresini,* 221 F.Supp.2d 600, 605 (D.Md.2002) ("While the Fourth Circuit may be reluctant to impose liability on police officers whose omissions create increased dangers from third parties, there is no indication that the court would have the same reluctance where it is an officer's affirmative conduct that creates the danger.").

Defendants also rely extensively on *Schoenfield v. City of Toledo,* 223 F.Supp.2d 925 (N.D.Ohio 2002). In that case, Shoenfield attempted to purchase a

---

**6.** While recognizing that it is bound by the Fourth Circuit's decision in *Pinder,* the Court notes that the approach taken therein has not been universally accepted. *In Robinson v. Township of Redford,* 48 Fed.Appx. 925, 2002 WL 31398974 (6th Cir.2002), the Sixth Circuit reversed a district court decision granting a motion to dismiss where the defendant police officer, after responding to a burglar alarm at a business, informed one of the business's employees that the premises had been searched and were safe. The officer left, the

employee entered based on his assurances, and the intruder, who had been hiding inside, shot and killed the employee. The *Robinson* court noted that the case lay "in the gray area between creating a danger and failing to protect from a danger" and permitted discovery to proceed. *Id.* at 929. *See also* Erwin Chemerinsky, *Government Duty to Protect: Post–DeShaney Developments,* 19 TOURO L. REV. 679, 685 (2003) (referring to *Pinder* as "one of the most restrictive interpretations of DeShaney").

gun at a department store, but employees declined to complete the transaction because they felt that he was acting in a suspicious manner and because he had fresh cuts and bruises on his hands and arms. *Id.* at 927. After Schoenfield left the store, the employees called the police, who apprehended him a short distance away. *Id.* Shoenfield explained that he and his wife had been having marital difficulties; one of the officers went to Schoenfield's home, where his wife reported that she had not been a victim of domestic violence. *Id.* His wife did, however, inform the officer that Schoenfield had suicidal tendencies, and that she believed Schoenfield had tried to buy the gun to kill himself. *Id.* Although this information was relayed to the officers who had detained Schoenfield, they subsequently released him. *Id.* Just a few hours later, he was able to purchase a firearm from another store, after which he checked into a hotel and committed suicide. *Id.*

The alleged conduct of Crosier and Moore goes beyond that of the officers in *Schoenfield.* The *Schoenfield* defendants left the decedent no worse off than he was they found him; the plaintiff in that case sought to hold them liable for their *inaction* and their failure to protect him. Nothing done by those defendants was alleged to have increased the risk, which existed prior to their encounter with the decedent, that he would take his own life. In the instant case, though, David was emotionally troubled but not suicidal when he first came into contact with Moore and Crosier. Unlike the *Schoenfield* defendants, Moore and Crosier allegedly engaged in a course of conduct that substantially increased the likelihood that David would kill himself, and according to Plaintiffs, the defendant officers were fully aware of the risk their actions created. The Sloanes seek to hold Defendants liable for their failure to protect David from a danger that Defendants themselves creat-ed, not merely from a danger of which Defendants were aware and ignored.

■ In order to rely on the state-created danger doctrine to impose § 1983 liability, a plaintiff must be able to articulate an action taken by a state actor that creates or substantially enhances a risk that the plaintiff will be harmed by a private actor. This rule can be seen through a comparison of two cases, one successful, one unsuccessful, but both of which involved scenarios where police officers' actions or inactions were arguably responsible for the death of an individual with whom the police did not have a special or custodial relationship. In *Monfils v. Taylor,* 165 F.3d 511 (7th Cir.1998), James Monfils called the Green Bay Police Department and anonymously informed an officer that Monfils's co-worker at a paper mill was going to steal company property as he left work. *Id.* at 513. The police called company security, who stopped the co-worker at the door and suspended him for five days when he refused to consent to a search. *Id.* Over the next two weeks, both Monfils and the co-worker made several calls to the police; Monfils was trying to make sure that the tape of his call would not be released, as he feared that his co-worker would recognize his voice and become violent, while the co-worker was attempting to obtain a copy of the tape. *Id.* at 513–14. Despite assurances from James Taylor, the Deputy Chief of Detectives, that the tape would not be released, the tape was, in fact, given to the co-worker. Within hours of the tape's release, Monfils was murdered by the co-worker and several accomplices. *Id.* at 514. The Seventh Circuit affirmed a district court decision denying Taylor qualified immunity, holding that his conducted violated Monfils's "right not to be placed at harm by state officials." *Id.* at 518. In contrast, the Sixth Circuit reached an op-

posite result in *Jones v. Union County*, 296 F.3d 417 (6th Cir.2002). In that case, the plaintiff alleged that police officers failed to serve her ex-husband with an *ex parte* order of protection she had obtained from a state court and that the police did not notify her regarding that failure. *Id.* at 422. Two weeks after the protection order had been entered by the court, the ex-husband broke into the plaintiff's home and shot her several times. *Id.* The Sixth Circuit held that the plaintiff had failed to state a state-created danger claim, as the sheriff's department's "failure to serve the *ex parte* order of protection did not create or increase the danger posed to Plaintiff by her ex-husband, or place her specifically at risk." *Id.* at 431.

██ The difference, therefore, between successful and unsuccessful state-created danger claims is found in the nature of the conduct of the defendant state actor. In *Monfils*, the murdering co-worker would not have found out who was responsible for his suspension but for the police officer's actions that revealed the plaintiff's identity. Thus, the plaintiff was put in danger only because the police acted knowingly in a particular manner. In *Jones*, on the other hand, the police did nothing to enhance an already-extant danger that the plaintiff would be assaulted by her ex-husband. The defendants' failure to comply with a statutory duty to serve *ex parte* protection orders did not place the plaintiff in a worse position than she was in before she encountered the police. In the instant case, the Sloanes allege that David became suicidal only in response to unduly coercive tactics employed by the defendant police officers. According to the Sloanes, these officers took no steps to mitigate the danger that they had created but that was not present prior to their interaction with David. On this basis, then, the Sloanes have articulated a cause of action under the state-created danger theory of liability.

The decision of the Tenth Circuit in *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir.1998), is also instructive. In that case, a sixteen-year old special education student was suspended by school officials after he harassed a younger student and threatened a teacher. A school counselor drove the student to the student's house in the middle of the school day without first determining whether the teen's parents were home. When the student's parents came home from work, they found their son in his bedroom, killed by a self-inflicted gunshot wound. *Id.* at 1257. The parents brought suit under 42 U.S.C. § 1983. After finding that the plaintiffs had established a genuine issue of material fact as to whether the defendants were aware of the student's suicidal tendencies and the risk that their actions imposed, the court held that on those facts a reasonable jury could conclude that the defendants should be liable for the student's death under the state-created danger doctrine. In reaching its conclusion, the court noted that in order for liability to be imposed under the state-created danger doctrine, "the environment created by the state actors must be dangerous; they must know it is dangerous; and, to be liable, they must have used their authority to create an opportunity that would not otherwise have existed for the third party's [acts] to occur." *Id.* at 1263 (quoting *Johnson v. Dallas Ind. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir.1994)).

██ Assuming the truth of the Sloanes' allegations, Crosier and Moore knew that David's emotional difficulties were such that their conduct would increase the risk that he would harm himself. By questioning David in an abusive manner outside his grandparents' presence, they created an environment in which he was far more likely to cause emotional injury to David. Unlike the defendants in *Pinder, Shoen-*

*field,* and other cases in which liability under § 1983 has been barred, Crosier and Moore engaged in affirmative conduct that significantly increased the risk that David would be seriously injured or killed. When a state actor takes actions (actions that, as discussed below, may themselves be unconstitutional) against an emotionally disturbed minor that the state actor knows will create or substantially enhance the risk that the minor will harm himself, and then fails to take any steps to mitigate that risk, he is subject to liability under 42 U.S.C. § 1983 pursuant to a theory of causation and duty premised on the state-created danger doctrine. As such, Plaintiffs' allegations are clearly sufficient to withstand a motion to dismiss.

### B. *Equal Protection Claim*

■ The Sloanes also argue that the defendants' conduct violated David's rights under the Equal Protection Clause of the Fourteenth Amendment. While Plaintiffs may be able to amend their complaint to articulate an equal protection claim under either the traditional rubric, in which a plaintiff alleges membership in a particular group (in this case, for instance, individuals with psychiatric or psychological disabilities) or a "class of one" theory,[7] they have failed to do so thus far. As the Fourth Circuit has stated, "to succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty,* 239 F.3d 648, 654 (4th Cir. 2001). A thorough analysis of Plaintiffs' complaint reveals that the Sloanes have not alleged that David was treated differ-

ently from other, similarly situated individuals. Accordingly, the Court finds that Plaintiffs have not stated an equal protection claim.

### C. *Other Federal Claims*

■■ In their memorandum opposing Defendants' motion to dismiss, the Sloanes argue that their complaint alleges a constitutional tort under the Fourth and Fourteenth Amendments that does not rely on the state-created danger doctrine. To the extent that the Sloanes allege that David was taken into police custody without probable cause, they have stated a viable Fourth Amendment claim. The Sloanes also argue that the interrogation was so coercive as to have violated David's right to due process under the Fourteenth Amendment. *See Chavez v. Martinez,* 538 U.S. 760, 774, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (noting that the Supreme Court has "left open the possibility that unauthorized police behavior . . . might 'shock the conscience' and give rise to § 1983 liability"). Defendants' reliance on the Supreme Court's recent decision in *Yarborough v. Alvarado,* 541 U.S. 652, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004), is misplaced. *Yarborough* involved an analysis of whether a state court was correct in denying a motion to suppress a defendant's statements based on an alleged *Miranda* violation. Plaintiffs do not seek to impose liability for a *Miranda* violation; instead, they argue that the coerciveness of the interrogation, given David's youth and psychiatric condition, was "conscience-shocking."

### D. *State Law Claims*

■ Despite Plaintiffs' earlier protestations that their complaint sought to invoke

---

7. See *Village of Willowbrook v. Olech,* 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.").

only state law, in opposing Defendants' motion to dismiss, the Sloanes have articulated their federal causes of action far better than they have defended their state-law claims. Similarly, Defendants have given short shrift to Plaintiffs' state-law claims in their briefs. Given the limited briefing submitted on this question, the Court declines to dismiss Plaintiffs' state-law claims at this time. The Court notes, however, the burden of proof apparently established by the West Virginia Supreme Court for wrongful death cases in which the decedent committed suicide:

> [R]ecovery for wrongful death by suicide may be possible where the defendant had a duty to prevent the suicide from occurring. In order to recover, the plaintiff must show the existence of some relationship between the defendant(s) and the decedent giving rise to a duty to prevent the decedent from committing suicide. Generally, such relationship exists if one of the parties, knowing the other is suicidal, is placed in the superior position of caretaker of the other who depends upon that caretaker either entirely or with respect to a particular matter.

*Moats v. Preston County Comm'n*, 206 W.Va. 8, 521 S.E.2d 180, 189 (1999). Unless Plaintiffs are able to articulate a theory of liability that falls outside the *Moats* framework, they will need to prove, in order to defeat a motion for summary judgment, that by taking custody of David in the absence of his grandparents, Moore and Crosier had assumed the role of David's caretaker. However, West Virginia law, of course, is not coextensive with federal law with respect to the duty of police to protect individuals from private violence. *Compare Pinder, supra, with Randall v. Fairmont City Police Dep't*, 186 W.Va. 336, 412 S.E.2d 737, 747–49 (W.Va.1991). By alleging that Moore and Crosier engaged in illegal conduct that was the proximate cause of David's death, Plaintiffs have sufficiently alleged a wrongful death claim under West Virginia law.

### E. Punitive Damages

■■■■ Finally, Plaintiffs' complaint seeks punitive damages. As Defendants point out, the West Virginia legislature has limited the availability of punitive damages:

> In any civil action involving a political subdivision or any of its employees as a party defendant, an award of punitive or exemplary damages against such political subdivision is prohibited.

W. Va.Code § 29–12A–7(a) (2003). Clearly, Plaintiffs may not seek punitive damages directly from Defendant Kanawha County Sheriff Department. A plain reading of the statute, however, does not bar punitive damages against a political subdivision's employees.[8] Thus, the Court strikes Count IV of Plaintiffs' complaint, but only to the extent it seeks punitive damages against the Department. If at a later time the individual defendants provide more extensive briefing and submission of case law that would support their position that they are immune from a claim for punitive damages, the Court will revisit the issue.

---

8. In this case, Plaintiffs have alleged constitutional torts against the named defendants. Under well-settled law, the Department may not be held liable for these claims under a *respondeat superior* theory of liability. *See Monell v. Dep't of Soc. Services*, 436 U.S. 658, 681, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1971). While the statute would clearly bar punitive damages as a result of derivative liability, Moore and Crosier's liability cannot be imputed to the Sheriff Department. The fact that the Sheriff Department may indemnify its employees not convert punitive damages "against" an employee into punitive damages "against a political subdivision."

## III. Conclusion

██ The Court recognizes that in order to defeat a motion for summary judgment, the Sloanes will have to overcome enormous obstacles. The defendants may be able to demonstrate that they took no steps to protect David from self-inflicted harm in reasonable reliance on the presence of his counselor. They may be able to demonstrate that given the evidence available to them, their interrogation of David was justified. Further, they may be able to demonstrate that even if their tactics were unjustified and had tragic results, they are entitled to qualified immunity.[9] Nonetheless, the Court finds that Plaintiffs' complaint sufficiently alleges causes of action under both the United States and West Virginia Constitutions, **DENIES** Defendants' motion to dismiss and **ORDERS** Defendants to file their answers to the complaint within the time prescribed by Federal Rule of Civil Procedure 12(a)(4)(A). The Court **STRIKES**, however, Plaintiffs' claim for punitive damages against Defendant Kanawha County Sheriff Department

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties and to publish the Order on the Court's web site.

---

**9.** As the Supreme Court has consistently held, a plaintiff is not required to anticipate a defense of qualified immunity in his or her complaint. *See Crawford–El v. Britton,* 523 U.S. 574, 595, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). Defendants did not advance a qualified immunity defense in their motion to dismiss.