NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0722n.06

Case No. 10-4350

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
***Jul 05, 2012***
LEONARD GREEN, Clerk

| | | |
|---|---|---|
| ROCKY CUTLIP, SR., individually and as personal representative of the estate of deceased, Rocky Cutlip, Jr., | ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) ) | COURT FOR THE NORTHERN DISTRICT OF OHIO |
| CITY OF TOLEDO; TOLEDO POLICE DEPARTMENT; JOHN DOES, 1 THROUGH 5, | ) ) ) ) | |
| Defendants-Appellees. | ) ) | |

BEFORE: BATCHELDER, Chief Judge; CLAY and GILMAN, Circuit Judges.

ALICE M. BATCHELDER, Chief Judge. Death is inevitable. But when a person's death is sudden and inexplicable, all who observe it are marked by it, and the grief of the bereaved is particularly acute. And in those circumstances, we often feel compelled to assign a cause. This is such a case.

Rocky Cutlip, Jr. ("Rocky"), while gripped in the throes of a mental and emotional crisis, held a shotgun to his head, and when the police tried to take it away from him, he pulled the trigger. Rocky died instantly. Plaintiff-Appellant Rocky Cutlip, Sr. ("Cutlip") brought this 42 U.S.C. § 1983 lawsuit against the City of Toledo and the Toledo Police Department[1] because of their roles in the

---

[1] The police department is not a separate entity from the City of Toledo and thus is not a proper party separately subject to suit. Cutlip did not specifically name any police officer as a defendant in this case.

events leading to his son's death. Cutlip claims that the City's failure to train and supervise its police officers regarding how to deal with mentally ill persons in these kinds of situations was a City policy that directly led to Rocky's death, and that the City was deliberately indifferent to the risk that this policy would violate someone's rights. The district court granted summary judgment to the City, holding that there were no disputes of material fact and that as a matter of law Cutlip could not demonstrate that either the police officers or the City violated Rocky's rights. Because Cutlip cannot demonstrate that the police officers were deliberately indifferent to Rocky's welfare during the incident in question, we AFFIRM the judgment of the district court.

## I. Factual Background

On May 29, 2007, after a stand-off with the police that lasted approximately two hours, Rocky pulled the trigger of a shotgun and ended his life. Although the parties do not dispute this essential fact, they do disagree about whether Rocky is responsible for his own death or whether the City is in fact liable. The facts are these.

Beginning on May 27, 2007, Rocky began to display erratic and paranoid behavior, and at some point on the day of May 28, Rocky ingested a toxic amount—approximately twenty-five pills—of Adderall, which is a prescription amphetamine. Around 2:30 a.m. on May 29, Rocky called 911 and claimed that there were police outside his home pursuant to "federal warrants." In fact, there were no police officers outside his home and no warrants had been issued against him. Rocky told the 911 dispatcher that he had a gun in the house, that the gun was not meant for the police, and that there were children in the house. Rocky, himself a police officer employed at the Lucas County Common Pleas Court at the time of his death, also claimed that federal government

2

agents had sneaked into his house and demobilized his service weapon. The 911 dispatcher had trouble making sense of Rocky's call and dispatched two Toledo police officers to check on his safety.

When the police officers arrived at Rocky's home, they spoke to Meegan Webb, Rocky's fiancée, who told them about the Adderall pills and that Rocky was behaving strangely. While speaking to Webb inside the doorway of the home, the police officers spotted Rocky at the top of the stairs and asked him to come talk to them, but Rocky ran down a hallway to a bedroom, grabbed a shotgun, and pointed it at his head. The police officers asked Webb to step outside the home, and after they were not able to convince Rocky to relinquish the shotgun, they called for a negotiator to come to the scene.

The police negotiators on duty and available at the time of the incident, Officers Gillen and Korsog, arrived within minutes of each other, at around 3:00 a.m. Gillen, who had arrived first and had begun speaking with Rocky, acted as the primary negotiator. When Gillen first arrived, Rocky was sitting on his bed and holding the shotgun to his head, but within approximately ten to fifteen minutes Gillen was able to convince Rocky to place the shotgun in his lap and engage the safety latch. Meanwhile, other police officers were working to remove the children from the house and interview neighbors, Webb, Cutlip, and Rocky's employer in order to better understand the issues with which Rocky was dealing. After receiving information that Rocky had diabetes in addition to having ingested an Adderall overdose, police officers contacted the local fire department to ask how they might deal with Rocky's potential chemical imbalance. Upon the fire department's suggestion, they gave Rocky a candy bar and a drink.

In negotiating with Rocky, Gillen tried to use "hooks" to form a bond with Rocky, and spoke to Rocky about his family, the fact that they were fellow police officers, and other common experiences, a tactic that is consistent with the crisis-intervention-team ("CIT") and hostage-negotiator training that Gillen had received. During the negotiation, Gillen and Korsog crouched in the bathroom doorway of the hall leading to Rocky's room, and Gillen could apparently see Rocky's eyes, gauge his expression, and clearly hear his words. Gillen's conversation with Rocky was "all over the map" because Rocky would fluctuate between calmness and excitement. Gillen stated that he had difficulty establishing a consistent rapport with Rocky, although at one point Rocky thanked Gillen for prolonging his life.

At some point in the negotiations, Rocky asked to speak with his father, a request that was granted provided Rocky put his shotgun down. Rocky, however, refused and immediately became more upset; he released the shotgun's safety, pointed the gun at his head, began crying, and said "it's time." Although the police had purportedly been prepared to negotiate for as long as it was necessary to ensure that Rocky would relinquish the shotgun of his own accord, Gillen now believed that Rocky was preparing to kill himself, and over a period of time the "frantic" negotiators made several calls requesting that the SWAT move in and prevent the suicide attempt. The negotiators and supervisors at the scene were aware that an attempt to force Rocky to relinquish the shotgun could lead to Rocky's killing himself, but believed that "he was ultimately going to hurt himself if we don't act immediately."

As Gillen's conversation with Rocky progressed towards its sad conclusion, other officers had formulated a contingency plan should negotiations fail, and when the negotiators informed them

4

that immediate intervention was needed, the plan was implemented. The police officers knew that Rocky would be able to see them coming up the hall to his room and would have time to shoot himself or the officers, so they hoped that deploying a "flash-bang" device would allow them to distract Rocky long enough for them to make a move. In most barricade situations, SWAT would throw the flash-bang device into the room with the barricaded individual in order to stun him, but the police officers were concerned that the close proximity of the flash-bang detonation could startle Rocky and cause him to pull the trigger involuntarily. Instead, the police officers decided to deploy the flash-bang device on a stick near the window of the room that Rocky was barricaded in, hoping that the effect would be to distract without startling him too much. Because SWAT had been informed that Rocky was occasionally pointing the shotgun away from his face, SWAT also hoped to detonate the flash-bang at a time when Rocky was not pointing the shotgun at himself. The police officers also decided to load the SWAT point-man's weapon with bean-bag rounds instead of conventional ammunition; the plan was that as soon as the flash-bang was deployed, the point-man would shoot Rocky and disarm him without seriously wounding him.

One police officer stated, "what happened was obviously [not] the result that we wanted. . . . It was the last thing we wanted." At approximately 4:38 a.m., SWAT detonated the flash-bang and moved toward Rocky's bedroom; moments after the flash-bang went off—"as the first officer entered the doorway"—Rocky pulled the trigger on the shotgun and killed himself.[2]

---

[2]The parties dispute the amount of time between the flash-bang detonation and the shotgun blast. Cutlip argues that the sounds were simultaneous, which suggests that Rocky was startled into pulling the trigger by the sound of the flash-bang. As we will explain, even when this factual dispute is resolved in Cutlip's favor, because the police did not display a conscious indifference to Rocky's life, the fact that he may have been startled into pulling the trigger does not change the outcome of the case.

Cutlip filed this § 1983 suit against the City of Toledo, arguing that the City was deliberately indifferent to the safety of its citizens by failing to properly train and supervise its police force in how to deal with barricaded suspects who are suicidal or mentally ill, and that this lack of training and supervision was directly responsible for the death of his son. The City filed a motion for summary judgment, arguing that under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 199–201 (1989), the City is not subject to liability under the facts of the case. The district court agreed, holding that neither the "state-created-danger" nor the "custody" exception to the *DeShaney* rule applies to this case, and that without an underlying constitutional violation the City is not subject to suit for failure to supervise or train its police officers. The district court also held that the unavoidable liability doctrine barred liability because if the police officers had done nothing the City might still have been subject to suit by Cutlip. *Id.* at 6–7. Cutlip filed a timely appeal, and we have jurisdiction.

## II. Law

### A. Standard of Review

In cases like this, where the district court has granted the defendant's motion for summary judgment, we review the arguments of the parties afresh. *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010). We affirm summary judgment if "the pleadings together with depositions, answers to interrogatories, admissions on file, and affidavits, if any, 'show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). The moving party, here the City, "bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's

6

claims," and that it is entitled to judgment as a matter of law, after which the non-moving party, Cutlip, "must present sufficient evidence from which a jury could reasonably find for him," *id.*, and must do so "set[ting] forth specific facts." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" if it may affect the outcome of the case. *Id.* at 248. Accordingly, this court must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law," and in doing so "draw all reasonable inferences in favor of the non-moving party." *Jones*, 625 F.3d at 940 (internal quotation marks and citations omitted).

**B.** Legal Analysis

Cutlip brings this action under § 1983, claiming that the City violated Rocky's substantive due process rights. Section 1983 supplies a remedy against "any person" who, acting under color of state law, deprives another person of rights protected by the Constitution; municipalities and other local government entities are considered "persons" under § 1983. 42 U.S.C. § 1983; *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). In such cases we examine whether (1) there was a deprivation of a constitutional right, and (2) the municipality is responsible for that violation. *See Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 463 (6th Cir. 2006). However, because the Due Process Clause does not normally require the municipality "to protect the life, liberty, and property of its citizens against invasion by private actors," *Deshaney*, 489 U.S. at 195, as is the case here, we must examine whether either of the two exceptions to the *Deshaney* rule apply, as follows:

7

> Under the first exception, when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being. . . . Under the second exception, where a State creates a perilous situation that renders citizens more vulnerable to danger at the hands of private actors, a plaintiff may bring a substantive due process claim . . . .

*Schroder v. City of Fort Thomas*, 412 F.3d 724, 727–28 (6th Cir. 2005) (internal quotation marks and citations omitted); *see also Koulta v. Merciez*, 477 F.3d 442, 445 (6th Cir. 2007); *McQueen*, 433 F.3d at 463–64.

Cutlip has sued only the City of Toledo, a municipality, but he must still show that the police officers involved with Rocky's death violated Rocky's constitutional rights under one of the exceptions to the *DeShaney* rule. *See, e.g.*, *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) ("Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm."); *accord Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 568–69 (11th Cir. 1997). Once an underlying constitutional violation is shown, the plaintiff "must prove that the municipality's policy or custom caused the alleged injury"; one such policy can be "a policy of inadequate training or supervision." *Ellis*, 455 F.3d at 700 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). The plaintiff must prove that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Id.*; *see also Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911–12 (6th Cir. 1995).

Cutlip argues that there are disputed issues of fact material to both the custody[3] and the state-created-danger exceptions. Although Cutlip also argues on appeal that the City is subject to municipal liability, the district court did not reach the issue because it found that there was no underlying constitutional violation.[4] R. 41 (Dist. Ct. Op.) at 4–7. Accordingly, on appeal we will analyze only whether there was an underlying constitutional harm.

### 1. Custody Exception

The Supreme Court has suggested that the custody exception might support a Due Process claim against a municipality where the victim committed suicide. *See Deshaney*, 489 U.S. at 198 (noting that its earlier opinion in *Youngberg v. Romeo*, 457 U.S. 307, 102 (1982), recognized a duty to "involuntarily committed mental patients . . . to ensure their reasonable safety from themselves" (internal quotation marks and citation omitted)); *see also Hasenfus v. LaJeunesse*, 175 F.3d 68, 71–72 (1st Cir. 1999) (stating that courts have recognized a "narrow" custody exception for the suicide of incarcerated persons where the correction officers were deliberately indifferent to the risk of suicide). But, as a matter of law, this is not a case to which the custody exception applies. As *Deshaney* explained, and as other courts have recognized, the custody exception applies in situations where "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Deshaney*, 489 U.S. at

---

[3]The custody exception is referred to by some courts as the "special relationship" exception.

[4]The district court mentioned the municipal liability issue only to state: "Though Plaintiff establishes that Defendant had a policy of not providing a psychological consultant at negotiations in violation of its own written policy, Plaintiff can point to no right this violates; thus the argument fails."

199–200; *see Sanford v. Stiles*, 456 F.3d 298, 304 n.4 (3d Cir. 2006) (holding that the custody exception applies only where there is a "'deprivation of liberty' through, for example, incarceration or institutionalization"); *Schroder*, 412 F.3d at 727–28 (addressing the custody exception by stating that "[h]aving incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994))); *Christiansen*, 332 F.3d at 1280 (holding that absent "involuntary restraint" such that the individual is no longer able to "protect himself or herself" there is no duty of care imposed by the custody exception); *Sargi*, 70 F.3d at 910–11 (finding compelling that "unlike imprisonment or commitment to a mental institution, compulsory school attendance does not restrict a student's liberty such that neither the child nor his parents are unable to attend to the child's basic human needs" and so cannot qualify for the custody exception). Accordingly, the kinds of "deprivation of liberty" that trigger the custody exception are "incarceration, institutionalization, or other similar restraint[s]." *Deshaney*, 489 U.S. at 200.

Even accepting all the facts as Cutlip paints them, the legal result is clear: Rocky was not incarcerated, institutionalized, or put under a similar restraint at the time that he killed himself—in fact, he had not even been arrested. There is no evidence that the police put him in a position where he was unable to care for himself. To the contrary, he could have put the shotgun down and left his bedroom at any time, as the police negotiators were imploring him to do, and it is undisputed that he was mentally disturbed before the police arrived at his house, even if his suicidal proclivity only manifested itself at that time. Rocky was not put into a helpless position by the police; his actions

were purely voluntary. As a matter of law, this is not the type of custody that transforms the state into caretaker.

Cutlip argues, nonetheless, that we should hold that Rocky was in custody because he was "seized" for the purposes of *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)—that is, "when a police officer restrains the liberty of a citizen in such a way that a reasonable citizen would reasonably believe under the circumstances that he or she was not free to leave." *Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002) (citing *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). For support he cites *Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003), which opined that

> The [plaintiffs] argue that their claim should be treated under the custodial exception to *DeShaney*. It is clear, however, that there was no custody here. There was no "intentional application of physical force and show of authority made with the intent of acquiring physical control." *Ewolski v. City of Brunswick*, 287 F.3d 492, 506 (6th Cir. 2002).

*Id.* at 709 n.1. But *Ewolski*, which *Bukowski* cited in sole support of this rule, was discussing "seizure" within a Fourth Amendment "excessive force" context, *not* "custody" within a Substantive Due Process *Deshaney* analysis. *See Ewolski*, 287 F.3d at 505–08 ("[A]lthough [decedent] *was never in police custody*, the police surrounded the house and paraded an armored vehicle in front of [decedents'] house. These actions qualify as an intentional application of physical force and show of authority made with the intent of acquiring physical control." (emphasis added)). These are legally different concepts. Indeed, when *Ewolski* turned to its *Deshaney* analysis it defined the custody exception as "when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable

11

safety," which is a difficult and more exacting standard than for a Fourth Amendment seizure.[5] *Id.* at 509. To the extent that *Bukowksi* might be construed to modify *Ewolski* and the general understanding of what it means to be in custody under the *Deshaney* exception, we narrowly interpret *Bukowski* to require—at a minimum—actual, physical restraint of the suspect by the police. *See Bukowski*, 326 F.3d at 709 n.1 (remarking that custody was at a minimum the "intentional *application of physical force* and show of authority made with the intent of acquiring physical control" (emphasis added)). In this case, with all factual inferences made in Cutlip's favor, there is no evidence that the police ever applied physical force, that Rocky was ever physically subdued, or that he was ever helpless. Applying the custody standard to these facts, we conclude that Rocky was not in custody.

## 2. State-Created-Danger Exception

The second *Deshaney* exception formulated by the federal courts is the state-created-danger doctrine.[6] As an initial matter, it has yet to be established that this exception applies to cases such as this one, where the victim committed suicide despite efforts by the police to prevent it. *Deshaney*

---

[5]The reason for a more exacting standard should be obvious. Say two bank robbers are holed up inside a bank and have violently resisted arrest; the police have the bank surrounded and there is no possibility for escape. Under *Ewolski*, the bank robbers are "seized" for Fourth Amendment purposes because they could reasonably believe they are not free to leave the bank. *Ewolski*, 287 F.3d at 505–08. Now suppose that one bank robber turns and shoots the other. Under Cutlip's reasoning, as soon as the bank robbers were seized for Fourth Amendment purposes they were also in custody under the first *Deshaney* exception. This would mean that the police had a duty to protect one violently resisting bank robber from the other, and that the deceased bank robber's estate could sue the police for violation of his Substantive Due Process rights. We cannot interpret the custody exception so broadly.

[6]The Supreme Court has not expanded upon its observation in *Deshaney* that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them," which is the genesis for the state-created-danger doctrine as adopted in the various federal courts of appeal. The Supreme Court has not considered the state-created-danger doctrine within the context of suicide. In addition, the Fifth Circuit has refused to explicitly recognize the state-created-danger doctrine. *See Bustos v. Martini Club, Inc.*, 599 F.3d 458, 466 (5th Cir. 2010).

stated, as a general rule, "that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." 489 U.S. at 197. Put another way, officials and municipalities are liable under § 1983 only for injuries that they directly cause, unless one of the two *Deshaney* exceptions imposes a duty to protect from "private violence." *See id.* at 196–201; *Koulta*, 477 F.3d at 443; *Schroder*, 412 F.3d at 727–28; *Jones v. Union Cnty.*, 296 F.3d 417, 431 (6th Cir. 2002). Under the custody exception, the municipality assumes the duty to protect by placing the person in a helpless position, even if the municipality and its agents had nothing to do with the injury. The state-created-danger doctrine is different; it imposes a liability on the municipality for harms that it has *indirectly* inflicted on the victim through an intervening agency whose actions are attributed to the state actor.[7] *See McQueen*, 433 F.3d at 464 (suggesting that the state-created-danger doctrine imposes liability for murder by a third-party because that person was in effect "acting under color of state law for purposes of § 1983"); *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065–66 (6th Cir. 1998) ("Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence.").

---

[7]The Second Circuit explained that:

> Our distinction between these categories of cases suggests that "special relationship" liability arises from the relationship between the state and a particular victim, whereas "state created danger" liability arises from the relationship between the state and the private assailant. To paraphrase [*Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982)], the police officers . . . did not bring the victim to the snakes; they let loose the snakes upon the victim.

*Pena v. Deprisco*, 432 F.3d 98, 109 (2d Cir. 2005).

But a situation where the victim committed suicide does not fit neatly into the state-created-danger doctrine.[8]   This Circuit has never found liability under the state-created-danger doctrine where the victim committed suicide, and indeed, although a number of courts have considered the state-created-danger doctrine within the context of suicide, the primary cases that have found or seriously entertained liability have involved the suicide of minors where school officials or police were in some way responsible.   *See, e.g.*, *Armijo v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1262–64 (10th Cir. 1998); *Sloane v. Kanawha Cnty. Sheriff Dep't*, 342 F. Supp. 2d 545, 553 (S.D.W.V. 2004).  *But see Hasenfus*, 175 F.3d at 72 (stating that "[i]f sound, [*Armijo*] is at the outer limit" of state-created-danger cases).   Nearly all cases that considered the state-created-danger doctrine in the context of suicide have rejected liability on the merits, finding in most cases that the municipality did not create the danger—i.e., the self-destructive impulse—through an affirmative act, and in the balance of cases that the state agents did not act with deliberate indifference or in a way that shocked the conscience.[9]

---

[8]The Tenth Circuit appears to be the only Circuit that has explicitly held that liability for suicide falls easily within the state-created-danger doctrine, although most other Circuits have at least considered it.  *See Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 917–18 & n.6 (10th Cir. 2012) (stating that in *Armijo* the Tenth Circuit had "effectively but unremarkably extended application of the state-created danger theory to instances of suicide, undeniably another form of private violence").

[9]*See Coscia v. Town of Pembroke*, 659 F.3d 37, 40–41 (1st Cir. 2011); *Stanford v. Stiles*, 456 F.3d 298, 310–12 (3d Cir. 2006); *Christiansen*, 332 F.3d at 1281–82; *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 709–10 (7th Cir. 2002); *Hasenfus*, 175 F.3d at 73–74; *Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 992 (7th Cir. 1998); *Robischung-Walsh v. Nassau Cnty. Police Dep't*, 421 F. App'x 38, 40–41 (2d Cir. 2011); *Garrett v. Belmont Cnty. Sheriff's Dep't*, 374 F. App'x 612, 617–18 (6th Cir. 2010); *Logan v. Sycamore Cmty. Sch. Bd. of Educ.*, 780 F. Supp. 2d 594, 599 (S.D. Ohio 2011); *Ferreira v. City of E. Providence*, 568 F. Supp. 2d 197, 211 (D.R.I. 2008); *Bynum v. City of Magee*, 507 F. Supp. 2d 627, 634–35 (S.D. Miss. 2007); *Schoenfield v. City of Toledo*, 223 F. Supp. 2d 925, 929–30 (N.D. Ohio 2002); *Doe v. Londonderry Sch. Dist.*, 970 F. Supp. 64, 76–77 (D.N.H. 1997); *Lewis v. Cnty. of San Bernardino*, No. EDCV 11-01594 VAP, 2011 U.S. Dist. LEXIS 144396, at *14–18 (C.D. Cal. Dec. 14, 2011); *Perez v. Town of Cicero*, No. 06-C-4981, 2011 U.S. Dist. LEXIS 113412, at *11–24 (N.D. Ill. Sept. 30, 2011); *Mohat v. Mentor Exempted Vill. Sch. Dist. Bd. of Educ.*, No. 1:09 CV 688, 2011 U.S. Dist. LEXIS 58319, at *15–24 (N.D. Ohio

14

The rarity of *Deshaney* liability for suicides can be partially attributed to the high standard of proof in state-created-danger cases, but it is also uniquely difficult to assign constitutional liability to the government when the non-custodial victim harms himself. As a general principle, people cannot violate their own constitutional rights, and where a person makes a free and affirmative choice to end his life, the responsibility for his actions remains with him. That a state official somehow contributed to a person's decision to commit suicide does not transform the victim into the state's agent of his own destruction. *Cf. Jones v. Reynolds*, 438 F.3d 685, 694 (6th Cir. 2006) (holding that where a person "bears some responsibility for the risks she has incurred, it is even more difficult to say that the 'state' has 'created' the 'danger' to her by its affirmative acts"). Given that the Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended," the "doctrine of judicial self-restraint" cautions us not to automatically extend the state-created-danger exception to suicide, particularly because the Supreme Court has been largely silent on this doctrine. *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

---

May 31, 2011); *Scruggs v. Meriden Bd. of Educ.*, No. 3:03-CV-2224, 2007 U.S. Dist. LEXIS 58517, at 37–44 (D. Conn. Aug. 7, 2007); *Maxwell v. Stammitti*, No. 1:07CV0043, 2007 U.S. Dist. LEXIS 53369, at *7–11 (N.D. Ohio July 24, 2007); *Estate of Rhode v. East Vincent Twp.*, No. 05-CV-5875, 2007 U.S. Dist. LEXIS 26676, at *7–18 (E.D. Pa. April 9, 2007); *Townsley v. W. Brandywine Twp.*, No. 06-758, 2006 U.S. Dist. LEXIS 23725, at *18–24 (E.D. Pa. April 26, 2006); *Nordstrom v. Proulx*, No. 04-3215, 2006 U.S. Dist. LEXIS 37931, at *7–10 (D. Minn. Feb. 7, 2006); *D.P. v. Sch. Dist. of Poynette*, No. 03-C-310-C, 2004 U.S. Dist. LEXIS 4903, at *57–59 (W.D. Wis. Mar. 16, 2004); *cf. Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 992–93 (1st Cir. 1992) (holding that there was no liability where the victim jumped out of the ambulance because the state officials did not make an affirmative act simply by placing him in the ambulance and not restraining him, even though they knew he had jumped out of vehicles before); *Lansdown v. Chadwick*, 152 F. Supp. 2d 1128, 1141–43 (W.D. Ark. 2000) (holding that there was no liability where decedent set the fire that caused his death). *But see Conradt v. NBC Universal, Inc.*, 536 F. Supp. 2d 380, 392–95 (S.D.N.Y. 2008) (denying defendants' motion to dismiss where the decedent committed suicide after seeing that his home was surrounded by police and television cameras and he was about to be arrested for sexually soliciting a minor); *Heckenswiler v. McLaughlin*, No. 06-415,12008 U.S. Dist. LEXIS 76771, at *47–53 (E.D. Pa. Sept. 30, 2008) (denying summary judgment to defendants in a case where a barricaded suspect committed suicide after a long stand-off with police).

Despite our reservations about the applicability of the state-created-danger doctrine to suicide cases, because there is some question in this case about whether Rocky intentionally committed suicide or whether he involuntarily pulled the trigger after the police detonated the flash-bang device, we will accept Cutlip's version of this factual dispute and proceed to apply the state-created-danger doctrine to determine whether the City can be liable under § 1983.

In order to show a constitutional violation pursuant to the state-created-danger doctrine, we must find each of the following elements:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Estate of Smithers v. City of Flint*, 602 F.3d 758, 763 (6th Cir. 2010) (citing *Reynolds*, 438 F.3d at 690). The only prong at issue is whether an "affirmative act" by the police officers increased the risk that Rocky would kill himself; there is no debate that Rocky was specifically at risk and that the police officers knew that he was at risk. Crucially, the police officers' affirmative acts must be made with deliberate indifference, which this Circuit has "equated with subjective recklessness." *See Ewolski*, 287 F.3d at 513 ("[The] plaintiff [must] show that the state 'official knows of and disregards an excessive risk to [the victim's] health or safety. . . . in a manner demonstrating 'reckless or callous indifference' toward the individual's rights." (internal quotation marks and citations omitted)). And, where the police are choosing from a number of risky options, "a plaintiff must show that the police 'knowingly and unreasonably' opted for a course of conduct that entailed a substantially greater total risk than the available alternatives." *Id.* at 515; *see Sperle v. Mich. Dep't*

*of Corr.*, 297 F.3d 483, 493 (6th Cir. 2002) (explaining that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference" (quoting *Farmer*, 511 U.S. at 837)).

As a legal matter, the accepted facts simply do not show that the police officers acted with a callous indifference towards Rocky's rights. First, the mere act of the police officers' responding to Rocky's 911 call and attempting to speak to him does not, as Cutlip darkly implies, by itself constitute an affirmative act that increased the likelihood that Rocky would kill himself. *See Tanner v. Cnty. of Lenawee*, 452 F.3d 472, 478–79 (6th Cir. 2006) ("[T]he state-created-danger exception has never been extended to cover situations where the police simply respond to the scene of a 911 call . . . ."); *see also May v. Franklin Cnty. Comm'rs*, 437 F.3d 579, 585–86 (6th Cir. 2006) ("[W]e decline to interpret the Due Process Clause in such a manner as to discourage law enforcement officers from responding to requests for assistance."). The police simply could not have known that Rocky would respond to their presence by running into his room and placing the shotgun to his head, and "from a policy perspective, imposing liability on the officers for acting in this manner would dissuade the police from responding expeditiously to 911 calls." *Tanner*, 452 F.3d at 479. Expecting the police simply to leave after witnessing Rocky's bizarre behavior, as Cutlip appears to argue for, is neither reasonable nor desirable.

The one affirmative action identified by Cutlip that could have legitimately increased the danger to Rocky was detonating the flash-bang device and initiating the forced entry into Rocky's bedroom. But the record does not support a finding of deliberate indifference on the part of the police officers. It is not disputed that the police chose to use this method only after they believed

they were out of other options. The negotiators initially intended to use as much time as necessary to convince Rocky to put his weapon down. The police knew about his drug overdose and another potential medical problem, and attempted to ameliorate these issues by offering him food and drink. After the negotiations had proceeded for some time, Rocky's mood and behavior suddenly changed, and he put the shotgun to his head, started crying, and repeatedly said "it's time." At that point, the negotiators subjectively believed that Rocky was soon going to kill himself, and until the time that SWAT moved in the negotiators made increasingly "frantic" calls for immediate intervention.

The facts show that the police officers believed that a forced entry presented a better chance for Rocky's survival than not going in at all, and the police made the decision with the knowledge that forced entry would be dangerous for both themselves and Rocky. Far from showing a callous disregard for Rocky's life, the police tried to modify their traditional forced-entry techniques to reduce the risk of harm to Rocky. For instance, instead of rolling the flash-bang inside the bedroom, the police detonated the flash-bang outside the window with the hope that it would distract him without startling him. In an effort to minimize injury to Rocky, the point-man loaded his shotgun with bean-bag rounds, and the police hoped to make their entry at a time when Rocky was not holding the shotgun to his head. Even if the police in this case made the wrong decision or employed improper forced-entry techniques for the situation, "[m]erely demonstrating that [they] incorrectly assessed the competing risks may demonstrate negligence, . . . but it is not enough to show a callous disregard for the safety of [Rocky]." *See Ewolski*, 287 F.3d at 514 (finding no liability in a barricade situation where the police made a forced entry with an armored vehicle and incendiary devices even

18

though the suspect killed his son and himself after the entry began).[10]  Cutlip repeatedly argues that the *only* possible outcome from the forced entry was Rocky's killing himself, but this is clearly incorrect—the other possible outcome was that the police would successfully disarm Rocky.  And even if Cutlip's assertion were true, since the negotiators believed that Rocky was definitely going to kill himself, which Cutlip does not deny, it cannot be said "that the police 'knowingly and unreasonably' opted for a course of conduct that entailed a substantially greater total risk than the available alternatives."  *Id.* at 515.

Cutlip has also argued that, regardless of the merits, there are several disputed, material issues of fact that make summary judgment on this issue inappropriate.  As we have pointed out, Cutlip does not appear to challenge that the police actually did believe that making a forced entry with the flash-bang presented a better chance for Rocky's survival than taking another action; rather he argues that this belief was unreasonable given the facts.  He points to the fact that there was potentially a forty-seven-minute break between the time that the negotiators asked for SWAT and when SWAT actually went in, which should have warned the police at the scene that Rocky was not

---

[10]Comparable cases in other courts have come to similar conclusions. *See Christiansen*, 332 F.3d at 1281–82 (holding that there was no liability where police attempted an ineffectual forced entry against a single barricaded suspect who immediately committed suicide, even though the suspect had told the police that he would kill himself if they entered his house, because the "defendants' actions throughout the day demonstrated [that] they intended to remove [the suspect] from the dangerous situation that he himself had created," and "the Due Process Clause is not a guarantee against incorrect or ill-advised [government] decisions" (alteration in the original; internal quotation marks and citation omitted)); *Ferreira*, 568 F. Supp. 2d at 211 (holding that the use of a flash-bang device to distract a suicidal woman barricaded in a car and the subsequent forced-entry attempt to take her gun away did not lead to liability for her death under the state-created-danger doctrine because police did not create the danger to the victim and their actions were not conscience shocking); *see also Andrews v. Wilkins*, 934 F.2d 1267, 1270–71 (1st Cir. 1991) (holding that it is not a constitutional violation "for a state officer to attempt an ineffectual rescue," and mere negligence does not violate the Fourteenth Amendment); *Kepner v. Houstoun*, 164 F. Supp. 2d 494, 497–500 (E.D. Pa. 2001) (stating that under a deliberate indifference standard, it does not "shock the conscience" that the police made an ineffectual attempt to rescue hostages from their schizophrenic captor).

19

really about to commit suicide. Standing alone this fact might give us pause, but it is also undisputed that the negotiators repeatedly renewed their calls for intervention throughout the forty-seven-minute period, and became progressively more frantic about an impending suicide attempt. These accounts establish that Rocky was increasingly disturbed and apparently about to commit suicide, and under these circumstances, the amount of elapsed time does not create a genuine issue of material fact. Cutlip also argues that there is evidence to support a finding that Rocky involuntarily pulled the trigger after the police detonated the flash-bang. But this fact, even if true,[11] does not affect whether or not the police acted with conscious indifference; they were aware of this risk, attempted to minimize it, and were sadly unsuccessful. *See Christiansen*, 332 F.3d at 1281–82; *Ewolski*, 287 F.3d at 514; *Ferreira*, 568 F. Supp. 2d at 211. Given their not-unreasonable fear that Rocky was about to commit suicide, the police were at most negligent in using the flash-bang and making a forced entry into Rocky's bedroom.

But Cutlip's most forceful argument is that the district court improperly ignored the testimony of Hugh M. McGowan, who was retained by Cutlip to "offer opinions related to the policies, procedures, supervision, and training of the Toledo Police Division" as they pertain to Rocky's death. *See* R. 30. Ex. 3 (McGowan Aff.), at 1. We "accept the testimony of plaintiff's expert" at the summary judgment stage, *see May*, 437 F.3d at 585, but all of the expert's testimony

---

[11]Cutlip bases this interpretation solely on Gillen's testimony that he heard only one blast. But Gillen does not actually state that the sounds were simultaneous, merely that he only heard one. Another police officer testified that he distinctly heard two blasts—with the shotgun blast a few moments after the flash-bang report—and that it was possible that the deafening sound of the flash-bang prevented Gillen from hearing the later shotgun blast. R. 35 (Gilmore Dep.) at 72:7–75:20. We do not believe this testimony is actually conflicting, but out of an abundance of caution we will accept Cutlip's interpretation for the purposes of this appeal.

must be admissible evidence. *See, e.g.*, *Bailey v. Floyd Cnty. Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997). Accordingly, the expert opinion must be based on the facts in the case and cannot represent legal conclusions. *See Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994). As an initial matter, many of McGowan's opinions are relevant to whether the City improperly or insufficiently trained the police personnel who were involved with Rocky's standoff, and whether this failure to train contributed to Rocky's death, but these opinions are not relevant to our decision. As we explained, in this appeal we are considering only whether there could be an underlying constitutional violation, not whether the City could be responsible for that violation.

McGowan's opinions that *do* directly relate to whether the police violated Rocky's constitutional rights either do not present a material dispute of fact or simply are not supported by the record. For example, McGowan opined that: Rocky presented no danger to anyone but himself; "Gillen was not trained to make an informed decision about a delusional barricaded subject"; there was always very high probability that Rocky would shoot himself when SWAT made the forced entry; and the use of a flash-bang device was in "gross violation of generally accepted police practice" and its use was inappropriate with an individual who was paranoid and delusional and was pointing a shotgun at his head. *Id.* at 7–9. Although we accept these opinions to be true for the purpose of our analysis, they do not show that the police had a callous disregard for Rocky's life when—as McGowan does not deny—they believed he was about to commit suicide.

McGowan also makes a number of assertions that, so far as we can tell, are not based on the record and are averred solely for the purpose of satisfying the elements of the state-created-danger

doctrine. He stated that the police "stormed the room with no reasonable justification and no chance of disarming" Rocky; that "no immediate danger" had been presented by Rocky before SWAT went in; that SWAT's entry was "not much different than taking a paranoid, delusional and potentially suicidal person to the edge of a cliff and showing him where to jump"; and accordingly that "the actions of the police . . . reflect a conscious indifference to the near certainty that their actions would result in" Rocky's death. *Id.* at 7–10. As we have stated, on summary judgment we are not required to accept expert opinions that lack a basis in fact. *See Greenwell*, 184 F.3d at 497 ("Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the evidence."); *Bailey*, 106 F.3d at 145 (holding that the content of a plaintiff's allegedly material, disputed issue of fact must be admissible in order to be taken into account on summary judgment). McGowan apparently ignored the undisputed fact that Rocky, after being relatively calm and coherent, pointed the shotgun at his head, placed his finger on the trigger, began weeping, and repeatedly declared "it's time"—this sequence of events is not even mentioned in his affidavit. Any intimation that there was no immediate danger to Rocky and no subjectively reasonable justification for forced entry is flatly contradicted by the record.

Further, McGowan's assertion that the police betrayed a conscious indifference to Rocky's life is an improper legal conclusion because it is an opinion "that suggest[s] the answer to the ultimate issue or that give[s] the jury all the information from which is can draw inferences to the ultimate issue." *Berry*, 25 F.3d at 1353. In considering a § 1983 municipal liability case, the court in *Berry* said of the expert testimony proffered by the plaintiffs that:

> Although an expert's opinion may embrace an ultimate issue to be decided by the trier of fact, the issue embraced must be a factual one. The expert can testify, if a proper foundation is laid, that the discipline in the Detroit Police Department was lax. He also could testify regarding what he believed to be the consequences of lax discipline. He may not testify, however, that the lax discipline policies of the Detroit Police Department indicated that the City was deliberately indifferent to the welfare of its citizens.

*Id.* (citing Fed. R. Evid. 704(a)) (internal quotation marks omitted; editorial marks omitted); *see also DeMerrell v. City of Cheboygan*, 206 F. App'x 418, at 426–27 (6th Cir. 2006). Here, McGowan identified the precise legal standard[12] relevant to this case and claimed that in his opinion the police had displayed this mental state. This is an improper legal conclusion and would not be admissible at trial; accordingly, we will not take this opinion into account when making our summary judgment determination. All told, Cutlip has not identified any material fact that is genuinely disputed in this case.

### III. Conclusion

Because we do not find any genuine, material, disputed issue of fact and because the police did not display conscious indifference to Rocky's life, we believe that summary judgment is appropriate in this case. The police did not violate Rocky's constitutional rights, and without an underlying constitutional violation, the City is not liable under § 1983. Accordingly, we **AFFIRM** the judgment of the district court.

---

[12]McGowan stated that the police displayed "conscious indifference" to Rocky's life, while the legal standard is "deliberate indifference"; for all intents and purposes these terms appear to be synonymous.

**RONALD LEE GILMAN, Circuit Judge, dissenting.** I agree with much of, even most of, the majority's analysis. This includes its conclusions that the only applicable exception to *DeShaney*'s general no-liability rule is the state-created-danger prong, that simply demonstrating that the police negligently assessed the competing risks is not enough to create liability, that the actions taken by the police do not indicate a "callous indifference" to Rocky's rights, and that we should not take into account the legal conclusions of Cutlip's expert witness that go to the ultimate issue of liability.

But even with all that being said, I believe that the grant of summary judgment was inappropriate in this case. I say that because a key fact in dispute—as acknowledged by the majority—is "whether Rocky intentionally committed suicide or whether he involuntarily pulled the trigger after the police detonated the flash-bang device." (Maj. Op. at 16) Because all material facts must be construed in favor of the nonmoving party when evaluating a motion for summary judgment, the majority properly noted that "we will accept Cutlip's version of this factual dispute." *Id.*

This key factual point then meshes with the legal standard applicable to this case as set forth in *Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002); i.e., did the police act with "subjective recklessness" by "'knowingly and unreasonably' opt[ing] for a course of conduct that entailed a substantially greater total risk than the available alternatives." *Id.* at 513, 515 (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 (1994)). According to Hugh M. McGowan, a former commanding officer of the New York City Police Department's Hostage Negotiation Team and Cutlip's expert witness, they did.

McGowan supports his opinion with the following points that find arguable support in the record:

- There were no hostages and Rocky posed no risk to others;

- After Officer Gillen requested the immediate SWAT response, at least 47 minutes elapsed during which Rocky made no attempt to harm himself; and

- The use of the "flash-bang" device was a "gross violation of generally accepted police practice" and "particularly inappropriate under circumstances involving a suspect with his finger on a trigger and a shotgun under his chin as it is known to have a startle effect, causing involuntary movements."

Since we must assume for the purposes of summary judgment that Rocky indeed died because "he involuntarily pulled the trigger after the police detonated the flash-bang device," McGowan's testimony raises a genuine dispute of material fact as to whether the police acted recklessly by "'knowingly and unreasonably' opt[ing] for a course of conduct that entailed a substantively greater total risk than the available alternatives." *Ewolski*, 287 F.3d at 515 (quoting *Farmer*, 511 U.S. at 846).

This is not to say that a jury will so find. But the evidence presented by Cutlip is sufficient to raise a genuine dispute as to whether the state-created-danger exception to *DeShaney* is applicable here. The proof, in other words, is not "so one-sided that [the City of Toledo] must prevail as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). I therefore respectfully dissent.